IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| PATTI LANGLEY, | * |
| | * |
| Plaintiff, | * |
| | * |
| vs. | *  No. 4:05CV00360 SWW |
| | * |
| SEARS, ROEBUCK & COMPANY, | * |
| | * |
| Defendant. | * |

MEMORANDUM OPINION AND ORDER

Plaintiff Patti Langley filed this complaint on January 31, 2005, in the Circuit Court of Pulaski County, Arkansas, seeking a review of a decision denying her claim for Long-Term disability ("LTD") benefits under a plan offered through her employer, defendant Sears, Roebuck & Company ("Sears"). Sears removed the action to federal court on the basis that the claim is covered by the provisions of the Employee Retirement Income Security Act of 1974 (as amended), 29 U.S.C. § 1001 *et seq.* ("ERISA"). The administrative record has been filed with the Court and the parties have filed their briefs. For the reasons stated below, the Court finds that the decision to deny plaintiff benefits should be reversed.

**Background**

Sears provides disability benefits, both short term and long term, to eligible employees through a program funded by Sears and administered by Metropolitan Life Insurance Company ("MetLife"). At the relevant time period, Langley worked as a store general manager. She had been employed at Sears for thirty years.

In April 2004, Dr. Jeff Carfagno referred plaintiff to Dr. C. Lowry Barnes, an orthopedist, after plaintiff complained of left knee pain. After their first visit, Barnes reported that plaintiff had been diagnosed by Dr. Michael Jones "as having acute atypical rheumatoid arthritis." Dr. Barnes reported that plaintiff complained of increasing left knee pain over the past 3 months, but that Prozac, prescribed by Dr. Carfagno, "gave her excellent relief from her chronic pain." Dr. Barnes reported that on examination, plaintiff was "neurologically intact distally," "[s]traight leg raising is negative," and [h]ip exam is normal." He noted moderate effusion but indicated her "patella tracks centrally and her knee is stable." Dr. Barnes noted she lacked 15 degrees of extension and flexed to 100. Radiographs showed no acute bony abnormality. She did "have some arthritis in her right knee on the lateral aspect." Dr. Barnes ordered a MRI of her left knee. AR-0258

On May 5, 2004, following the MRI, plaintiff returned to Barnes. He noted that the MRI showed a "medial and lateral meniscus tear," and reported that "[w]e are going to proceed with arthroscopy of her left knee." AR-0257  Plaintiff had surgery on her left knee on May 14, 2004. AR-00261  She submitted a claim for Short-Term disability ("STD") benefits after her surgery. AR-0005

On May 18, 2004, plaintiff returned to Barnes for a follow-up after surgery. He reported her knee was stable and in excellent alignment. He recommended an "aggressive therapy program, 3x a week for the next 3 weeks." Dr. Barnes noted plaintiff was working 10 hours per day and was on her feet most of the day. He stated: "I do not think she has a knee that is going to allow her to continue to do that." Dr. Barnes noted he would see plaintiff in three weeks for a re-evaluation. Ar-0256

On May 20, 2004, plaintiff visited physical therapist Greg Calaway. He noted plaintiff was "ambulating at this time with no obvious gait deviation," and was "able to do a straight leg raise at this time with no extensor lag seen." He recorded plaintiff had done very well following her surgery, and his long-term goal was to return plaintiff to "full function and activity with no pain or limitations in her left knee within 8 weeks." AR-0273-74

On May 21, 2004, MetLife wrote plaintiff a letter, approving her claim for STD benefits effective May 14, 2004 through June 17, 2004. MetLife explained what information it would need in order to consider extending her benefits. AR-0005

On May 24, 2004, plaintiff began physical therapy under the supervision of a number of physical therapists, including Greg Calaway. AR-268-70  On May 24 and 26, the physical therapists reported that plaintiff had no new complaints or increases in pain. During those sessions, plaintiff engaged in a number of exercises including quad sets, straight leg raises, and leg swings. At the May 26 session, plaintiff indicated that she wanted to continue her therapy on her own at home. AR-271-72  On June 2, 2004, plaintiff returned and reported experiencing "some increased discomfort over the weekend when she attempted to do her exercises on her own. For that reason she came back for treatment. She felt she could do her exercises at home but after experiencing problems decided to come back to therapy." She did quad sets, straight leg raises, leg swings for five minutes, and biking for five minutes. Calaway noted she tolerated her treatment well. AR-270 On June 3 and 4, plaintiff engaged in approximately 35 minutes of physical therapy under the supervision of Calaway. Each time he noted she tolerated her treatment well. AR-268-69.

At some point in late May or early June 2004, Barnes recommended that plaintiff have right knee arthroscopy. On June 8, 2004, Barnes performed the surgery. In his operative notes, he stated

3

that plaintiff had "done well" with her left knee arthroscopy. AR-0259 On June 10, plaintiff returned to Barnes for a follow-up. He noted she was "doing well" and would again undergo "an aggressive therapy program." AR-0255 In a brief note that same day, Barnes said plaintiff should not return to work until September 1, 2004. AR-315

On June 11, 2004, MetLife wrote plaintiff a letter reminding her that her STD benefits would terminate effective June 17, 2004, if she did not supplement her claim with the following information by June 25, 2004:

> 1. Copies of the two most recent:
>    ● Office notes.
>    ● Diagnostic test results.
>    ● Operative reports and discharge summaries, if applicable.
>    ● Rehabilitation or therapy notes, if applicable.
> 2. Names and dosages of all current medications.
> 3. Functional abilities.
> 4. Expected return to work date.

AR-0004

On June 14, 2004, plaintiff returned to physical therapy. She reported to Calaway that her left knee continues to be a little stiff and sore but she had more pain from her right knee having just undergone surgery. She participated in a number of exercises and Calaway indicated plaintiff tolerated her treatment well. AR-0266 On June 16, 2004, plaintiff returned to Calaway and reported no significant problems since her last visit. She participated in exercises and "tolerated her treatment well." AR-0265

Throughout this time period, plaintiff and MetLife communicated regarding the need for additional medical records. AR-0012-13 However, as of June 21, 2004, plaintiff had not provided MetLife with supplemental information requested in two previous letters. Therefore, on June 21,

2004, MetLife wrote plaintiff explaining that it closed her STD benefit claim as of June 17, 2004. MetLife informed her of her right to appeal the decision.  AR-0003

A few days after writing the June 21 letter, MetLife received up-to-date information from Barnes. The records included information pertaining to plaintiff's June 8 surgery.  AR-0014  Based on the new information, MetLife reversed its decision to terminate plaintiff's STD benefits.  In a June 30, 2004 letter to plaintiff, MetLife explained that it had approved plaintiff for benefits from May 14, 2004 through July 1, 2004.  MetLife again recited the documents needed to extend benefits beyond plaintiff's expected return to work date of July 1, 2004.  AR-0002

Plaintiff returned to Barnes on July 1, 2004.  He reported that she was "slowly making progress," "still has crepitance, but less pain," and "good range of motion of her knees today."  AR-0253 Also on July 1, 2004, physical therapist Mike Adkins completed a "Progess Report/Plan of Care" pertaining to plaintiff.  He noted that plaintiff had a total 14 scheduled physical therapy sessions, 4 of which were cancelled, 2 were no-shows, and 8 were kept.  He noted she denied any significant complaints since her last meeting and concluded she was "progressing well."  AR-0264

In a July 7, 2004 telephone conversation, MetLife explained to plaintiff that a nurse consultant would be reviewing her medical records and might contact her if MetLife needed more information regarding her claim.  AR-0014

On July 20, 2004, Barnes completed a "Physical Capacities Evaluation" ("PCE") pertaining to plaintiff.  He reported plaintiff could sit for eight hours, stand for three hours, walk for two hours, lift and carry up to twenty pounds frequently, and occasionally lift and carry twenty-one to fifty pounds.  He noted she could frequently bend and occasionally climb.  He said she could not squat,

crawl, or reach above shoulder level. Dr. Barnes reported she could grasp, push, and pull. He made no additional remarks about her limitations in a space on the form. AR-0263

Based upon the information available at the time, MetLife decided to extend plaintiff's benefits. By letter dated August 9, 2004, MetLife informed plaintiff that her claim had been approved from May 14, 2004 through August 14, 2004. MetLife again recited the documents it would need to extend benefits beyond plaintiff's expected return-to-work date of August 15, 2004. AR-0001. In a telephone conversation on August 10, MetLife explained to plaintiff that if she needed an extension beyond August 14, she would have to submit updated medical information. AR-0017

On August 17, 2004, plaintiff returned to Barnes for a follow-up. He noted that she continued to complain of pain in both knees. He recited her medications: Vicodin, triamterene, amitriptyline, Vioxx, and Advil. Dr. Barnes noted she had crepitus throughout a range of motion in both knees but no significant swelling. Her hip examination was normal, her straight leg rasing was negative, and she was grossly neurologically intact. Dr. Barnes concluded that plaintiff was "going to continue activities as tolerated" and he would see her again in about three months. AR-0252

In a letter faxed to MetLife on August 20, 2004, Dr. Barnes opined that plaintiff "had full range of motion in both knees, but full range of motion is painful." He added: "She is convinced that she would not be able to return to work. This is indefinitely that she will be unable to return to work. She cannot tolerate her current activities at work." He stated he would see her again in three months. AR-0281

On August 27, 2004, a MetLife nurse consultant reviewed plaintiff's medical records, including the July 20, 2004 PCE and Barnes' August 20 letter. After a review of the records, the nurse consultant noted that there were no objective findings to support plaintiff's assertion that she was physically unable to return to work. The nurse recommended that MetLife not extend plaintiff's benefits beyond August 14, 2004.

By letter dated August 27, 2004, MetLife denied plaintiff's claim for an extension of STD benefits. MetLife explained that plaintiff's medical records contained no objective findings to support her claim of continued disability. MetLife noted that the records showed she had good range of motion and a continued home exercise program. MetLife informed plaintiff of her right to appeal its decision and requested that she send medical records to support any appeal. AR-0279

On August 31, 2004, plaintiff contacted MetLife and asked to speak with the nurse consultant regarding information needed to support her claim. On September 1, 2004, the nurse consultant returned plaintiff's call. The nurse consultant explained that Barnes had not addressed functionality in his August 20 note, but simply subjectively stated that plaintiff could not work. The nurse reported that plaintiff understood that her functionality needed to be addressed and documented. AR-0019

On September 14, 2004, plaintiff submitted a Disability Appeal Request form to MetLife. Plaintiff stated on the form that her job requires her to be on the sales floor 80% of the time and that she must "walk - stand - move fixtures - move merchandise and set [merchandise] displays." She reported that she was only able to straighten her right leg with help and only able to bend her legs about 45 degrees. She complained her right knee would collapse if she moved "wrong," and that she

had fallen several times because of that problem. Plaintiff reported that she could only tolerate about one hour on her feet before she had to elevate her legs and apply ice to her knees. AR-0277.

Also on September 14, 2004, Barnes authored a letter to MetLife stating it had been called to his attention that plaintiff had been denied short-term disability benefits and explaining that plaintiff had "significant symptoms in both knees." He stated she had arthritis in both knees and "is having pain on a daily basis." He concluded by stating his "medical impression [is] that she [cannot] tolerate her current job activities." AR-0276

On September 29, 2004, MetLife's nurse consultant reviewed Barnes' letter and noted it was not accompanied by any objective findings such as a physical examination report or test results. AR-0021  In a letter dated September 30, 2004, MetLife informed plaintiff that it received her appeal request and had referred her claim for an independent review. AR-0275

On October 6, 2004, plaintiff contacted MetLife to inform it of her current medications. She reported she took Vicodin, Vioxx, amitriptyline, and Prozac. She also stated her pain averaged 5 on a scale from 1 to 10, that the maximum time she can spend on her feet is one hour, that her right knee sometimes "collapses" causing her to fall, and that she could straighten her right knee only with assistance. AR-0022

On October 10, 2004, MetLife contacted plaintiff to inform her that her appeal was still pending. She asked whether MetLife needed any additional medical documentation regarding her claim. MetLife advised her that she should send any documents she felt might change MetLife's previous decision to deny her claim. More specifically, MetLife informed plaintiff it had no doctor's notes or test results regarding her report that her knee giving out. AR-0023

On October 11, 2004, MetLife's nurse consultant reviewed plaintiff's file, noting her knee problems and surgeries.  The nurse consultant defined total disability as follows:

> You must be unable to perform the material and substantial duties of your job and not be working at any other job.  You must be under the care of a licensed health care provider and be following a prescribed course of treatment.  You[r] doctor must indicate your current medical condition and cite the reasons, due to your condition that you are unable to perform your job.  Your physician must support the need for your absence and certify your disability.

AR-0024   The nurse consultant noted Barnes' most recent letter to MetLife, dated September 14, 2004, contained no "clinical exam findings or functional impairments" supporting his statement that plaintiff cannot tolerate her job.  In the recommendation portion of the report, the nurse consultant concluded: "The medical documentation does not contain objective clinical evidence supporting a severity of symptoms or severity of functional impairments that would have prevented [plaintiff] from performing her own job duties."  The nurse consultant noted there is nothing in the record showing a need for assistance with ambulation, and there is nothing in the record of plaintiff having reported a fall.  The nurse  stated Barnes reported in his August 20 letter that plaintiff had full range of movement in both knees "but full [range of motion] is painful which is subjective."  AR-0024

Also, on October 11, 2004, MetLife informed plaintiff over the telephone that if Barnes believed she could not work, then MetLife needed medical information to collaborate that opinion.  Plaintiff advised MetLife that she would contact the doctor's office and ask for additional records.  MetLife noted that plaintiff wanted her appeal expedited and plaintiff stated it would be fine for MetLife to complete the review by the coming Thursday.  That same day, Barnes' office called to say he had not seen plaintiff since August.  AR-0025

After MetLife received some additional documentation, the nurse consultant continued the review of plaintiff's claim on October 12, 2004. The recommendation remained the same: "medical documentation does not support a severity of symptoms or severity of functional impairments that would have prevented [plaintiff] from performing own job duties." AR-0026 That same day, plaintiff contacted MetLife to inform it she had an appointment for a functional capacity evaluation ("FCE") on October 21, 2004, and requested that MetLife delay its decision until after receiving the FCE report. The FCE was later rescheduled for October 26, 2004. AR-0027

Plaintiff was referred for a FCE in order to answer the following questions:

1. Did Miss Langley provide full physical effort during testing?

2. Is Miss Langley capable of performing her pre-injury job? If not, what are her physical abilities?

3. Are Miss Langley's subjective reports reliable?

(AR-178)

During the October 26, 2004 FCE, plaintiff reported she could lift 20 lbs., carry 10 lbs., push/pull 25 lbs. a very short distance, sit for 30-45 minutes, standing 20 minutes, and walk 30 minutes. AR-0180-81 The FCE stated no limp was observed and that plaintiff's gait was consistent and guarding was not observed. AR-0191 Her active range of motion in her right knee was 100 degrees; 120 degrees in her left knee. Her muscle strength for both knees was 4/5. AR-0189 Special testing of straight leg raising from both supine and sitting positions produced no pain. The Hoover test, ankle Dorsi-Flexion, patellar shift, and Gordon toe tests were all negative. AR-0192.

The examiner summarized his findings as follows:

> Miss Langley requested to stop the Functional Capacity Evaluation (FCE) due to reported increase pain of a 6 on the functional pain scale in bilateral knees after a total testing time of 2 hours 41 minutes.
>
> Miss Langley did provide a full physical effort during this FCE until she requested to stop due to increased pain. Miss Langley's subjective reports are suggested to be reliable through overall test findings and clinical observations.

AR-0173 The test report did not answer question number 2, but the FCE did note that plaintiff's occupation as a store general manager is classified as sedentary by the Dictionary of Occupational Titles. AR-0174

MetLife forwarded a copy of the October 26 FCE to the nurse consultant for review. The nurse was instructed to review it to determine whether it changed the previous recommendation to deny continued benefits. AR-0028 The nurse consultant summarized the report and noted that plaintiff's 4/5 muscle strength was a good response, and even though plaintiff complained to increased pain during the evaluation, there are no pre-test and post-test blood pressure readings and heart rates documented to confirm those complaints. In addition, the nurse noted there were no other clinical observations documented which would have been indicative of increased pain, such as diaphoresis, facial grimacing, restlessness, bracing, clutching. The nurse consultant concluded that plaintiff's complaints of pain were not substantiated by the FCE. AR-0029

MetLife decided to uphold its previous denial of benefits, AR-0029, and informed plaintiff of its decision by letter dated November 12, 2004. The letter summarized relevant portions of the STD Plan and plaintiff's medical history. MetLife explained that after two reviews of her claim file, it determined that the medical information did not support plaintiff having a functional impairment that would render her unable to perform her sedentary occupation. MetLife explained plaintiff had

exhausted her administrative remedies under the Plan and that no further appeals would be considered. It further informed plaintiff of her right to file a civil action. AR-0168-171

## Standard of Review

The Supreme Court has stated that "a denial of benefits challenged under [20 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). If the plan confers such discretionary authority, then the Court must defer to the determination made by the administrator or fiduciary unless such determination is arbitrary and capricious. *Id. See also Lutheran Med. Tr. v. Contractors Health Plan,* 25 F.3d 616 (8th Cir. 1994).

Plaintiff asserts, and defendant does not appear to dispute, that the appropriate standard of review is *de novo.* Because the Plan contains no language expressly giving the plan administrator discretionary authority to determine eligibility for benefits, the Court finds this case is subject to a *de novo* standard of review.

## Discussion

The Short-Term Disability Plan provides in pertinent part as follows:

> The Short-Term Disability Program is designed to help you cope with an off-the-job illness or injury . . . by providing benefits when you're unable to work. . . . A compensable illness is an illness (including pregnancy) that disables you to the extent you are unable to perform your regular duties. A compensable injury is an injury sustained in an accident, incurred away from work that disables you to the extent you are unable to perform your regular duties.
>
> During the first seven calender days of an absence, unit management administers the program. . . . After you've been away from work for seven calendar days, you must contact MetLife, the program administrator . . . and work with a case manager.

> . . .
>
> The case manager also will work with your manager or HR representative to look at ways you can return to work . . . If it's impossible for you to return to work, your case manager can help you transition to the Sears Long-Term Disability Plan . . . after your short-term disability benefits run out.
>
> You receive 100% of pay for a maximum of 20 weeks during a 52-week period, depending on your length of service . . . If you have two or more years of continuous service, you can receive benefits for up to 20 weeks.

(AR- 0077)

> Sears' Long-Term Disability ("LTD") Plan provides in pertinent part as follows:
>
> If you are Disabled due to the same or related Illness or Injury for 140 days within any 180 consecutive-day period (the "Waiting Period"), you may be entitled to benefits from the LTD Plan. . . .
>
> . . .
>
> . . . Disabled under the plan means:
> 1. During the Waiting Period and for the next 24 consecutive months you are Incapable of Performing your Own Occupation for any employer in your Local Economy.
> 2. After that time period, you are Incapable of Performing the material duties of any gainful occupation for any employer in your Local Economy, for which you are reasonably qualified based on your training, education and experience.

(AR-0080)

> It may not be necessary for you to file a claim for Long-Term Disability, if you are receiving Short-Term Disability benefits. Generally, you only have to report your disability claim once. If payments transition from STD to LTD, you may not need to submit more paperwork.

(AR-0083)  The LTD Plan permits a claimant to appeal a denial of LTD benefits, and requires the

claimant to file a written appeal within 180 days of the adverse decision. (AR-0141).

In her complaint, Langley complains Sears wrongfully denied her claim for LTD benefits.

Sears asserts that plaintiff never applied for LTD benefits and has never been denied LTD benefits.

13

In addition, Sears says because she never applied for LTD benefits, plaintiff did not exhaust her administrative remedies. From a review of the record, the Court finds that plaintiff's request was treated as a claim for STD benefits. The diary review report shows an entry on May 21, 2004, approving a claim for STD from May 14 to June 17, 2004 (AR-0010), entries on June 29, 2004, referring to the decision to extend STD through July 1, 2004 (AR-0014), an entry on August 27, 2004, referencing a decision to deny extension of STD benefits (AR-0019), an entry on September 29, 2004, regarding information necessary to substantiate further STD benefits (AR-0021), and a notation on October 6, 2004, that if plaintiff''s STD benefits are reinstated or extended through the maximum, "will need to begin LTD review potential." AR-0022. Her appeal of the decision to provide benefits only through August 14, 2004, was denied by letter dated November 12, 2004, which referenced her claim for STD benefits. AR-0168. Based on a series of e-mails, it is clear that if plaintiff had been approved for the full 20-weeks of STD benefits, a claim for LTD benefits would be considered. AR-0157, 0161, 0162. However, plaintiff was denied STD for the maximum 20 weeks and, therefore, it appears MetLife never considered a claim for LTD benefits.

    The Court has conducted a *de novo* review of the administrative record and determines that MetLife made the wrong decision in denying plaintiff further STD benefits. Following a functional capacity evaluation in August 2004, Barnes stated that while plaintiff has a full range of motion of both knees, that range of motion is painful. He stated she could not tolerate her current activities at work. AR-0281. Approximately one month later, Barnes noted plaintiff has arthritis in both knees and is having pain on a daily basis. He again stated his belief that plaintiff could not tolerate her current job activities. AR-0276  The FCE examiner also confirmed plaintiff's complaints of pain. He noted that plaintiff asked to stop testing after 2 hours and 41 minutes due to increased pain. He

found her subjective reports to be reliable through overall test findings and clinical observations. AR-0173  The Court finds sufficient evidence in the record to determine that plaintiff is unable to perform her regular duties as general store manager.

## Conclusion

For the reasons stated, the Court hereby reverses the decision denying plaintiff STD benefits, and orders defendant to pay plaintiff the full 20 weeks of STD disability benefits.

DATED this 27th day of September, 2005.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE